UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUST GOODS, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>JUST, INC., et al.,<br><br>    Defendants. | Case No. 3:18-cv-02198-WHO<br><br>**ORDER ON MOTION FOR ORDER TO SHOW CAUSE RE: CONTEMPT AND SANCTIONS**<br><br>Re: Dkt. No. 158 |

Despite mutually agreeing to terms to end this trademark and breach-of-contract case, the struggles continue for plaintiff Just Goods, Inc. ("JGI") and defendants Eat Just, Inc. (fka Just, Inc., fka Hampton Creek, Inc.) and founder Joshua Tetrick (collectively, "EJ"). Before me is JGI's motion for an order to show cause why EJ should not be held in contempt or sanctioned given EJ's failures to comply with my order enforcing the Term Sheet. As explained below, I hold EJ in contempt of that order for multiple violations. I also prescribe corrective actions that EJ must take within 14 days of the date this order issues or face further sanctions.

**BACKGROUND**

My March 30, 2020 Order (the "March 30 Order") sets out the background of this case and the parties' August 13, 2019 settlement under the provisions of their binding Term Sheet. Dkt. No. 142. As relevant here, in the March 30 Order I granted JGI's motion to enforce the Term Sheet. I determined:

> The Term Sheet permits EJ to use the term Just in the following ways: (1) in the Frame Logo, (2) as part of the names/phrases "Eat Just" and "Make it Just," and (3) in text in conjunction with a generic product name (e.g., Just Egg). Other uses of the term violate the parties' agreement.

March 30 Order 5. I further ordered EJ to comply with the Term Sheet by changing its corporate

Northern District of California

name to "Eat Just, Inc." rather than "Eat JUST, Inc." *Id.* 6. On May 15, 2020, I denied EJ's motion to stay that Order. Dkt. No. 156. On June 23, 2020, the Ninth Circuit denied EJ's emergency motion to stay. Dkt. No. 157.

On July 10, 2020, JGI moved for an order to show cause why EJ should not be held in contempt and sanctioned for continued failure to comply with the Term Sheet and the March 30 Order. Plaintiff's Motion for an Order to Show Cause re: Contempt and Sanctions ("Mot.") [Dkt. No. 158]. JGI asks that I find EJ in contempt, order compliance, impose a fine of $5,000 per day until it demonstrates compliance, and grant JGI attorney fees related to the pending motion.

At a hearing on the motion on August 19, 2020, JGI raised continued violations, including some not addressed in its Motion. EJ described its efforts to comply with the Term Sheet and the March 30 Order and its commitment to doing so. I instructed that the parties meet and confer over any continuing violations and submit a joint letter outlining any further disagreements. Prior to the parties' meeting, JGI raised another set of alleged violations. The parties have now submitted their Joint Letter, which indicates that many alleged violations have been resolved but that many others remain in dispute. Joint Letter [Dkt. No. 169].

**LEGAL STANDARD**

"Civil contempt consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 945 (9th Cir. 2014) (internal quotation marks, citation, and formatting omitted). The standard for a civil contempt finding is "well settled":

> The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court. The burden then shifts to the contemnors to demonstrate why they were unable to comply.

*F.T.C. v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999) (internal quotation marks and citation omitted). Although good faith does not constitute an exception a party's obligation to comply with a court order, "a person should not be held in contempt if his action appears to be based on a good faith and reasonable interpretation of the court's order." *Armstrong v. Brown*, 939 F. Supp. 2d 1012, 1018 (N.D. Cal. 2013) (quoting *In re Dual–Deck Video Cassette Recorder*

2

*Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir.1993)).

"Sanctions for civil contempt may be imposed to coerce obedience to a court order, or to compensate the party pursuing the contempt action for injuries resulting from the contemptuous behavior, or both." *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1380 (9th Cir. 1986). "Compensatory awards are limited to actual losses sustained as a result of the contumacy." *Id.* (internal quotations and emphasis removed).

## DISCUSSION

### I. IMPROPER USES OF "JUST"

JGI recites numerous uses of the word "Just" that allegedly violate the Term Sheet and the March 30 Order, including references to EJ as "JUST" or "Eat JUST, Inc." on its website, in job postings, on Tetrick's LinkedIn, and on EJ's Wikipedia page. Bost Decl. [Dkt. No. 158-1] ¶ 2 (displaying screenshots from July 10, 2020); Joint Letter 6–10, Ex. C. On May 18, 2020, just three days after I denied EJ's motion to stay its compliance with the March 30 Order, EJ referred to itself as JUST in press about a new business deal, and third-party press did the same.[1] Bost Decl. ¶ 3. At the hearing, EJ described its efforts to comply but also attempted to slough off areas of non-compliance because it was known as Just for many years and lacks control over third parties who continue to refer to it by its former name. As this Order describes, EJ has been less than diligent and its own waffling (to put it charitably) with respect to its new name has prevented progress on that name being more broadly adopted.

At this point, many of the alleged violations have been resolved. What follows are my determinations on the remaining disputed issues.

**a. Instagram Videos**

JGI represents that EJ has posted a number of videos on its Instagram account in which EJ employees refer to themselves as appearing on behalf of "Just." Joint Letter 6; Joint Letter Ex. C at 20. EJ disputes the exact number of these videos but does not dispute that some contain the reference to Just. Joint Letter Ex. C at 20. Additionally, JGI alleges, and EJ does not dispute, that

---

[1] EJ's attempts to distance itself from the third-party press is unpersuasive in light of the fact that the materials it prepared, distributed, and re-posted about the deal were clear violations.

3

1   one person appearing in the videos often wears a "Just for All" shirt, which violates the trademark
2   assigned to JGI under the Term Sheet. *Id.* These videos were posted from March 26, 2020 to
3   September 3, 2020. *Id.* The September 3 video was, according to EJ, removed "within an hour"
4   of EJ's legal department becoming aware of it. Joint Letter 3. EJ does not address the remaining
5   videos, other than to say that it "is reviewing each video to assess it . . . to remove the allegedly
6   improper use of 'Just.'" Joint Letter Ex. C at 20.

7   I find EJ in CONTEMPT OF COURT for posting these videos and keeping them up.
8   Many of the videos were posted after the March 30 Order and unambiguously state that those
9   appearing in them are there on behalf of "Just." As the March 30 Order makes clear, that use
10  violates the Term Sheet. March 30 Order 5. Further, instead of removing the videos (and, if EJ
11  wishes, reposting them edited to comply with the March 30 Order and the Term Sheet), EJ has left
12  the videos up to "assess" them. Joint Letter Ex. C at 20. EJ is, therefore, not taking "all
13  reasonable steps" to comply with my March 30 Order.

14  No later than 14 days after this Order issues, EJ is ORDERED to file an affidavit attesting
15  that the violations in the videos have been removed. If EJ fails to do so within this time limit, I
16  will impose sanctions in addition to those required by this Order.

17  **b. #MakeItJUST**

18  The March 30 Order made clear that EJ may use "Just" in the phrase "Make it Just."
19  March 30 Order 5. JGI argues that the use of the hashtag "#MakeItJUST" with only the word
20  "just" appearing in uppercase violates my March 30 Order. Joint Letter 10. That hashtag, with
21  that capitalization, has been used on EJ's LinkedIn, Twitter, Instagram, and Facebook and Andrew
22  Noyes's Twitter. Joint Letter Ex. C at 6–23.

23  The Term Sheet does not permit this choice of capitalization. EJ correctly notes that the
24  Term Sheet allows it to use both "Make it Just" and "MAKE IT JUST." Term Sheet ¶¶ 1, 15. It
25  does not follow, however, that it can emphasize only "Just." As EJ well knows, capitalization
26  matters a great deal in this dispute. EJ is permitted to call itself "Eat Just" but not "Eat JUST."
27  March 30 Order 5–6. As I made clear in the March 30 Order, "capitalization varies throughout the
28  Term Sheet, depending on the provision, term or product." *Id.* 6. That variation, I explained,

4

"indicate[d] that the absence of capitalization in Paragraph 5 of the Term Sheet was intentional." *Id.* Although "Make it Just" is not governed by Paragraph 5, the same principles apply. The uniform capitalization of "Make it Just" and "MAKE IT JUST" preclude a finding that the emphasis on only "Just" is permitted. EJ's emphasis of "Just" in "Make it Just," if permitted, would be a backdoor to re-associating itself with the uppercase "JUST" in violation of the Term Sheet.

The March 30 Order did not explicitly address this issue. Today's Order does. EJ is on notice that only emphasizing "just" in "Make it Just" is not permitted by the Term Sheet.

### c. Reposting and Retweeting Third Party Articles

The lion's share of JGI's remaining alleged violations are situations in which EJ, Tetrick, or Noyes shared third parties' articles on LinkedIn or Twitter that referred to EJ as "JUST." Joint Letter 8–9, Ex. C at 5–18. Some of these articles appear in LinkedIn posts or in tweets while other are "retweets."

Contrary to EJ's arguments, reposting or retweeting a third party's article on EJ's (or Tetrick's or Noyes's) social media accounts plainly qualifies as a "use" of "JUST" under the March 30 Order and the Term Sheet. As illustrated in the Joint Letter, when EJ posts third party articles on LinkedIn, the headlines for those articles—which, here, refer to EJ as "JUST"—appear beneath the text of the post. *See id.* 8. To take one typical example, a LinkedIn post by Tetrick contained the text, "An egg made from plants is selling better in stores around the country than many egg products made by chickens. Read more in VegNews" followed by a link to the article. *Id.* The article's headline then appears beneath that post: "JUST Sells the Vegan Equivalent of 50 Million Eggs." *Id.* In this example, a reference to EJ as "JUST" bears Tetrick's imprimatur. So too with the other posts and retweets. A reasonable consumer who sees these posts from EJ or its officers would conclude that EJ is or can be called "JUST." In response, EJ argues that it does not control these third parties' use of "JUST" in their articles. But it does control whether it approvingly shares those articles.

EJ's cursory argument that preventing it from sharing these articles might implicate the First Amendment is unpersuasive. *Id.* 3. EJ relies exclusively on *Bland v. Roberts*, 730 F.3d 368

1    (4th Cir. 2013), *as amended* (Sept. 23, 2013), which held that "liking" a political Facebook post
2    was political speech. *Id.* at 386.  Here, this trademark dispute is about commercial source
3    identifiers, not expressive or communicative speech. *See, e.g.*, *Mattel, Inc. v. MCA Records, Inc.*,
4    296 F.3d 894, 900 (9th Cir. 2002) ("Limited to this core purpose—avoiding confusion in the
5    marketplace—a trademark owner's property rights play well with the First Amendment.")  EJ is
6    not permitted by the Term Sheet to refer to itself as "JUST" to identify itself in commerce.

7    If EJ were permitted to end-run the Term Sheet and the March 30 Order by simply
8    reposting content from Third Parties instead of writing the headline themselves, the Term Sheet
9    and March 30 Order would mean little.  I hold that these reposts and retweets place EJ in
10   CONTEMPT OF COURT.

11   No later than 14 days after this Order issues, EJ is ORDERED to file an affidavit attesting
12   that all violations of my Order have been removed from these posts and tweets.

13   **d. Employees' LinkedIn Profiles**

14   Many of EJ's employees' profiles on LinkedIn state that they work at "Just" or "Eat
15   JUST."  Joint Letter Ex. C at 7, Ex. F.  EJ represents that it has "asked its employees" to change
16   their LinkedIn profiles but that it does not control its employees' social media accounts.  Joint
17   Letter 2.  In response, JGI argues that EJ should "mandate" that its officers, directors, and brand
18   managers change their profiles because they "often use their LinkedIn profiles on behalf of and to
19   promote EJ, and are therefore acting on behalf of EJ."  Joint Letter Ex. C at 7.

20   EJ is required to take all reasonable steps to comply with the March 30 Order.  That does
21   not include controlling employees' conduct outside the scope of their employment and many of
22   these employees' use of LinkedIn is likely outside the scope of employment.  But some of EJ's
23   employees likely are using LinkedIn within the scope of employment, if they use it to promote EJ.
24   To the extent that an employee's LinkedIn use is within the scope of employment, EJ must ensure
25   that the employee adheres to the March 30 Order and the Term Sheet.  As EJ knows or should
26   know, it cannot get around a court order by permitting its employees, within the scope of their
27   employment, to violate that order.  Because the record does not indicate whether any such
28   employees' profiles are still in violation, it is not possible to determine whether EJ is in contempt.

6

1      The burden is on EJ, not JGI or me, to identify those employees that qualify and take necessary
2      corrective steps.
3           No later than 14 days after this Order issues, EJ is ORDERED to file an affidavit attesting
4      that all employees of the class I describe here have been identified and that their LinkedIn profiles
5      have been brought into compliance with this Order.

6           **e.  eCommerce Pages**

7           JGI argues that EJ has failed to revise its seller pages on Amazon, Walmart, and Whole
8      Foods' websites to remove references to "Just" alone or "Eat JUST."  Joint Letter 5 & n.3, Ex. C
9      at 3–4.  EJ represents that those companies, not EJ, control the content of the pages, but that it has
10     submitted requests to them to remove or change the pages at issue.  *Id.* 2.  JGI asserts that EJ has
11     the power to make the changes unilaterally.  *Id.* 5 & n.3.  It is not possible to assess whether EJ
12     can or cannot make the changes on its own based on the evidence the parties have provided.
13          No later than 14 days after this Order issues, EJ is ORDERED to submit an affidavit that
14     either (1) attests that the violations have been removed from all pages or (2) describes the process
15     for altering the pages at issue and detailing its attempts to change them.

16          **f.  Wikipedia**

17          JGI argues that EJ has not taken reasonable steps to alter the page about it on Wikipedia,
18     which still refers to it as "Eat JUST" and "JUST" in several places.  *Id.* 7.  EJ responds that it does
19     not control Wikipedia.  *Id.* 2.  It represents that it has, for months, requested that Wikipedia make
20     the relevant changes.  Joint Letter Ex. C at 10.  JGI points out, however, that "[a]s long as the edit
21     is neutral and verifiable, Wikipedia allows users to edit its entries."  Joint Letter 7.  Further, JGI
22     contends that there is another reasonable step available to EJ: providing Wikipedia with the March
23     30 Order to facilitate the change.  *Id.*  At the hearing, EJ indicated it did not wish to do so because
24     the March 30 Order might then be posted on Wikipedia.  Although publication on Wikipedia
25     might lead to greater awareness, the March 30 Order is already a publicly available document.  If
26     EJ cannot directly edit the Wikipedia page as it claims, it is more than reasonable to provide
27     Wikipedia with a copy of the March 30 Order.  I find, consequently, that EJ has not taken all
28     reasonable steps to comply with my March 30 Order and is in CONTEMPT OF COURT.

No later than 14 days after this Order issues, EJ is ORDERED to submit an affidavit that either states the changes at issue have been made or that (1) details all of EJ's efforts to make those changes and (2) indicates that EJ has provided Wikipedia with a copy of my March 30 Order. If EJ fails to do so within this time limit, I will impose further sanctions. If EJ cannot directly edit the page, Wikipedia refuses its requests to make the changes, and provision of the March 30 Order does not change this, EJ will no longer be in contempt because it will have exhausted its reasonable steps.

### g. Business Wire Press Release

On May 18, 2020, just three days after I denied EJ's motion to stay its compliance with my March 30 Order, EJ referred to itself as "JUST" in press about a new business deal, and third-party press did the same. Bost Decl. ¶ 3. EJ represents that it has contacted Business Wire several times and Business Wire has refused to remove the press release. Joint Letter Ex. C at 11. Of course, EJ is responsible for this predicament because it drafted the press release—months after the March 30 Order and mere days after I refused it a stay—in the first place. That aside, EJ has not presented Business Wire with a copy of the March 30 Order to facilitate removal of the press release—a step that, as I explain above, is reasonable. Both disseminating the press release and not taking this reasonable step violated my March 30 Order. I hold EJ in CONTEMPT OF COURT.

No later than 14 days after this order issues, EJ is ORDERED to submit an affidavit attesting either that the violation in the press release has been removed or that it provided the March 30 Order to Business Wire to facilitate removal or editing. If EJ fails to do so within this time limit, I will impose sanctions until such an affidavit is filed. If Business Wire refuses to remove the press release despite receiving the March 30 Order, I will not further sanction EJ for the press release remaining up—though disseminating it in the first place was a clear violation of the March 30 Order.

### h. Miscellaneous Occurrences

Finally, JGI alleges several other violations: (1) photos on a page on EJ's website that include the word "JUST," (2) the use of "justfoods" in a URL for a store locator on EJ's website,

8

1   (3) uses of "JUST" in metadata on LinkedIn posts, and (4) the just of "JUST" on a single
2   Facebook event. Joint Letter Ex C. at 1, 2, 5, 21. The photos appear to have been removed. EJ
3   has represented it is doing all it can to remedy the second and third violations, and JGI does not
4   dispute that; it simply states that EJ remains out of compliance. *See id.* at 2, 5. Based on EJ's
5   unrebutted representations, I will not hold it in contempt because it is taking reasonable steps to
6   comply.

It is unclear how much control EJ has over the Facebook event. It represents the event "appears" to have been created by a third party, *id.* at 21, but Eat Just is listed as the "host" of the event. No later than 14 days after this Order issues, EJ is ORDERED to submit an affidavit attesting either that the violation has been removed or (1) that EJ does not and cannot control the post and (2) to the steps EJ has taken to remedy the violation.

## II. CORPORATE NAME

I unequivocally ordered EJ to change its corporate name from "Eat JUST, Inc." to "Eat Just, Inc." March 30 Order 6. In response to JGI's motion, EJ did not dispute that it had failed to do so. It instead argued that changing its corporate name with the States of California and Delaware would be futile because both states' secretary of state websites display corporate names with all capital letters. Defendants' Opposition to Mot. ("Oppo.") [Dkt. No. 159] 10–11. It is not up to EJ to decide whether compliance with the March 30 Order is futile; its job is to comply with that unambiguous order. At the hearing, I instructed EJ to provide JGI with proof that it has submitted amendments to its articles of incorporation with both states within two weeks. It has now done so. Joint Letter Ex. D, E.

## III. JU.ST DOMAIN NAME

JGI argues that EJ's use of the ju.st domain name violates the Term Sheet. Mot. 12. Neither the Term Sheet nor JGI's motion to enforce nor the March 30 Order refers to that domain name, which EJ represents it has used since 2016. Oppo. 5. The use is distinct enough that JGI needed to request specific relief in the underlying litigation. As noted at the hearing, I will not order EJ to discontinue its use of ju.st.

## IV. ATTORNEY FEES

### a. Past Order Granting Attorney Fees

EJ does not dispute that it has not paid the attorney fees I ordered on March 30 in the amount stipulated to by the parties on April 20, 2020. Dkt. Nos. 144, 148. Instead it argues that the Term Sheet provides that payment is not owed until a "final determination on the merits that there has been a breach" and that such a final determination will not occur until the Ninth Circuit resolves its appeal of my March 30 Order. Oppo. 8–9. JGI asserts that "final determination on the merits" in this context means the trial court's final decision. The issue is therefore one of interpreting the Term Sheet.

The parties do not present much authority for either interpretation, but the better reading of the Term Sheet is that "final determination on the merits" does not mean that appeals need to be exhausted. The decisions of district courts that leave no issues to be resolved are often referred to as "final." *See, e.g.*, 28 U.S.C. § 1291. A "final decision" under that appellate jurisdiction statute is "typically one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Parsons v. Ryan*, 912 F.3d 486, 502 (9th Cir. 2018). Moreover, the time to move for attorney fees under the Federal Rules of Civil Procedure is tied to the district court's issuance of its judgment. FED. R. CIV. P. 54(d)(2). For a time, in fact, the courts of appeals disagreed about whether a district court decision resolving the merits could be a final judgment if it did *not* include a fee award because it reserved consideration for later. *Int'l Ass'n of Bridge, Structural, Ornamental, & Reinforcing Ironworkers' Local Union 75 v. Madison Indus., Inc.*, 733 F.2d 656, 658–59 (9th Cir. 1984) (surveying the differing approaches). In the absence of any other evidence of the parties' intent, I hold that the Term Sheet does not require appellate exhaustion. Whether or not the Ninth Circuit agrees with the March 30 Order, it was a final determination on the merits.

EJ has pointed to no authority to the contrary. Its only citation is an unpublished Ninth Circuit decision in which the court affirmed in part, reversed in part, vacated, and remanded a district court decision. *Eastwood Ins. Servs., Inc. v. Titan Auto Ins. of N.M., Inc.*, 469 Fed. App'x 596, 599 (9th Cir. 2012). In doing so, it vacated the attorney fees because, under the parties'

10

agreement, attorney fees could only be awarded to the "prevailing party." *Id.* The court explained that "attorneys' fees should thus be deferred until there has been a final determination on the merits." *Id.* EJ argues that this statement shows that a final determination on the merits "include[es] appeals and remands." Oppo. 8. Even if *Eastwood* supported that proposition generally, it would not necessarily shed light on ordinary usage or on the parties' intent in drafting the Term Sheet. And *Eastwood* does not support EJ. There, the Ninth Circuit reversed the district court's grant of summary judgment and vacated the district court's decision—there was no final determination after the Ninth Circuit's mandate issued. *See Eastwood*, 469 Fed. App'x at 598–99. Notably, the Ninth Circuit did not indicate that it violated the parties' agreement to award attorney fees after a district court judgment. *See id.* at 599. If the Ninth Circuit vacates the March 30 Order, there will no longer be a final determination on the merits. Unless and until that time, there is.

I determined that EJ breached the parties' Term Sheet and, consequently, that JGI was entitled to attorney fees, which the parties stipulated would be in the amount of $37,500. EJ is ORDERED to pay JGI within fourteen days or obtain a bond to cover that amount, and not wait for the Ninth Circuit's resolution of its appeal.

**b. Fees for this Motion**

JGI asks that I order EJ to pay the attorney fees it incurred for the present dispute. I agree in part. EJ's behavior has been problematic. EJ committed itself to the Term Sheet more than a year ago. The March 30 Order is more than five months old. EJ dragged its feet, only to make a number of changes with alacrity when faced with the threat of contempt and sanctions. At least some of EJ's violations appear to be willful. EJ continued posting violative videos on Instagram for months after the March 30 Order—including as recently as September 3. EJ's press release that referred to itself as "JUST" was published three days after I denied a stay of my March 30 Order.

JGI asks in its motion for $10,370, based on attorneys billing 15.3 hours at $400/hr and 8.5 hours at $500/hour. I find that the hourly rates, the amount of time expended and the total amount sought are reasonable in light of the work performed, the prevailing hourly rates in the district and

11

1    the experience and skill of the attorneys who did the work, and GRANT that request as a civil
2    contempt sanction to coerce compliance and compensate JGI in part for injuries suffered as a
3    result of EJ's noncompliance with the Term Sheet. That amount shall be paid or covered by a
4    bond within fourteen days.

5          Of course, JGI made its fee request before the prior hearing and all of the back and forth
6    since the hearing, which has resulted in more work for its lawyers. I am not allowing additional
7    fees, at least at the moment, because JGI did not try to meet and confer before filing its motion for
8    an order to show cause. While ferreting out violations is not JGI's burden, I expect parties to
9    solve problems collaboratively and informally when possible. In the future, JGI should meet and
10   confer and attempt to resolve specific violations with EJ prior to filing a contempt motion.
11   That said, I may impose additional sanctions if the affidavit required by this Order shows
12   inadequate compliance.

### V.    THE COEXISTENCE AGREEMENT

14         The Term Sheet provides, "The 2014 Coexistence Agreement will be terminated and
15   replaced by this term sheet or the long form settlement agreement incorporating this term sheet
16   after receipt of the payment provided for in Paragraph 4 and Defendants' compliance with
17   Paragraphs 7, 14, and 15." Term Sheet ¶ 26. Among other things, the Coexistence Agreement
18   bars EJ from using the frame logo.

19         JGI briefly argued in its motion that EJ had not complied with Paragraph 15, which
20   required that EJ change its "social media handles and online platforms" and "its Wikipedia and
21   LinkedIn pages" to align with the new corporate name. Mot. 11–12; Term Sheet ¶ 15. In the Joint
22   Letter, JGI added the argument that EJ is out of compliance with Paragraph 14 of the Term Sheet
23   as well, which requires EJ to transfer domain names that include "Just for All" to JGI by Sep. 6,
24   2019. Joint Letter 10; Term Sheet ¶ 14. It also indicated in the Joint Letter that EJ is in breach of
25   Paragraph 7, which requires EJ to transfer the JUST FOR ALL trademark to JGI by Sep. 6, 2019.
26   Joint Letter 10; Term Sheet ¶ 7.

27         This issue was barely discussed in the parties' briefs. I will not now find, as JGI requests,
28   that EJ remains bound by the Coexistence Agreement. Among many other issues that may need to

be addressed to make that finding are whether EJ substantially performed; whether any or all of these concerns are now or soon will be moot; whether JGI's conduct constitutes a waiver; whether failure to adhere to the deadlines is a material breach; whether JGI can elect to enforce both the Term Sheet and the Coexistence Agreement; whether the Term Sheet is a novation; whether the failure to notarize and send six out of 76 trademarks is a material breach; and whether I can order any relief despite the case closing and EJ's appeal of the March 30 Order.

Full compliance with the March 30 Order and this Order would make this question moot. I deny this portion of JGI's motion without prejudice to it making a fully briefed argument at a later date if EJ's material noncompliance remains a problem.

## CONCLUSION

It has been more than five months since I ordered EJ to comply with the Term Sheet to which it agreed. EJ has violated the March 30 Order many times in many ways. As a result, I hold EJ in CONTEMPT OF COURT. EJ is ORDERED to immediately comply with the Term Sheet, the March 30 Order, and this Order. EJ shall submit the affidavit that I have outlined above. If it fails to do within 14 days after this Order issues, I will impose additional sanctions until it demonstrates that it is no longer in contempt.

EJ's affidavit must demonstrate that: (1) it has removed all violations in the Instagram videos discussed; (2) it has removed all violative third party articles discussed from the relevant LinkedIn and Twitter accounts; (3) it has identified all employees who use LinkedIn profiles within the scope of their employment and that all such employees' LinkedIn profiles do not include violations; (4) either (i) all violations have been removed from EJ's Amazon, Whole Foods, and Walmart pages, or (ii) it must describe the process for altering these pages and their attempts to do so; (5) either (i) EJ's Wikipedia page is no longer in violation, or (ii) it must describe its efforts to alter the page and attest that it provided Wikipedia with a copy of the March 30 Order to facilitate removal or editing; (6) either (i) the Business Wire press release has been removed or edited to remove the violations or (ii) it provided Business Wire with a copy of the March 30 Order to facilitate removal or editing; (7) it does not control the Facebook post discussed above and describes its efforts to have the violation in it removed; and (8) it either paid

1  JGI $47,870 or posted a bond in that amount.  JGI shall not file any counter-affidavit or other
2  pleading in response unless I ask for it.

3  EJ is ORDERED to pay JGI the sum of $47,870 as assessed in the March 30 Order and this
4  Order, or to post a bond in favor of JGI in that amount.

5  This Order should not embolden JGI to demand unreasonable interpretations of the Term
6  Sheet, the March 30 Order, or this Order, nor should it ignore unforeseen difficulties EJ
7  encounters while it redoubles its focus and efforts on compliance.  I expect cooperation and
8  collaboration to overcome any remaining difficulties.  Prior to filing a contempt motion about
9  specific alleged violations of my orders in the future, JGI shall meet and confer with EJ about the
10 alleged violations and both parties should work to resolve them in good faith.

11 **IT IS SO ORDERED.**

12 Dated: September 11, 2020

William H. Orrick
United States District Judge

14